# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA . CRIMINAL NO. 10-10264-RGS
         . CRIMINAL NO. 14-10074-RGS
   V.     .
         . BOSTON, MASSACHUSETTS
         . DECEMBER 10, 2014
MICHAEL DAVID SCOTT   .
  Defendant    .
. . . . . . . . . . . . . . . .

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:


UNITED STATES ATTORNEY'S OFFICE
Victor A. Wild, Esq.
One Courthouse Way, Suite 900
Boston, MA  02210
617-748-3145
victor.wild@usdoj.gov

COLLORA LLP
William Keefe, Esq.
100 High Street, 20th Floor
Boston, MA  02110
617-371-1005
wkeefe@collorallp.com




Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

*MARYANN V. YOUNG*
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

1  (Case called into session)

2  (3:43:15 PM)

3          THE CLERK:  The court for the District of

4  Massachusetts is now in session.  The Honorable Marianne

5  Bowler presiding the case, December 10, 2014.  The case

6  USA v. Scott, Criminal Action Nos. 14-10074 and 10-10264

7  may now be heard.

8          Will counsel.  Please identify themselves for

9  the record?

10         MR. WILD:  Good afternoon, Your Honor, Victor

11  Wild for the government.

12         THE COURT:  Thank you very much.

13         MR. KEEFE:  Good afternoon, Your Honor, William

14  Keefe for Mr. Scott and, Judge, I wanted to mention that I

15  spoke with Ms. Silva today and she was asking me on behalf

16  of Mr. Kettlewell and herself that I be, that I be a stand

17  in for them with respect to a couple of things that are on

18  the docket here today?

19         THE COURT:  Do you have any objection?

20         MR. WILD:  I don't know what those issues are,

21  but no I don't have any objection.

22         THE COURT:  Okay.  It would appear not to be a

23  problem.  All right, I have on the docket the two entries,

24  entries in each case, 249 and 44, the government's motion

25  for an order.  There's no opposition, correct, Mr. Keefe?

1    MR. KEEFE:  Is this the motion requesting that

2  we--

3    THE COURT:  This is the motion for an order

4  authorizing and directing Middleton to address the

5  defendant's healthcare.

6    MR. KEEFE:  Well, I guess I do object on cert--

7    THE COURT:  Well the time has run, am I not

8  correct, Mr. Garvin?  What are the filing dates?

9    THE CLERK:  Fourteen, the 2014 case and same,

10  same for the 2010.

11    MR. KEEFE:  Well I think I've filed--

12    THE COURT:  So the time has run.  I mean--

13    MR. KEEFE:  I think I filed the one paragraph

14  objection to his pleading and I think I addressed the

15  production of the medical records.

16    THE COURT:  Well it's not docketed as an

17  opposition.

18    MR. KEEFE:  Is it document number 44 maybe?

19    THE COURT:  44 is the motion in one case.  Okay,

20  okay, it's docketed as a response.

21    MR. KEEFE:  Yeah.

22    MR. WILD:  May I attempt to assist the Court?

23    THE COURT:  Sure.

24    MR. KEEFE:  I guess, Your Honor, one thing that

25  I wanted to remark was, I know Your Honor has had the

1  motion for release on conditions under advisement.  I

2  guess my perspective on it was that if that, if that were

3  acted upon and the Court ruled in the defendant's favor,

4  the Court mentioned that the Court might, might consider

5  releasing him on a humanitarian grounds, that if the Court

6  were to rule in the defendant's favor on that then this

7  issue of having a hearing with jail officials to determine

8  what kind of medical care--

9          THE COURT:  Yeah.

10          MR. KEEFE:  --they can provide, would be

11  somewhat moot.  I guess that's why I--

12          THE COURT:  Well I guess I want to know what the

13  status of things, I want to know whether or not the house

14  is his home is still secured?  There was some talk at the

15  last hearing that it might be foreclosed upon.  What is

16  the status there?

17          MR. KEEFE:  I don't think there's any

18  foreclosure proceedings that have been initiated.  The

19  primary mortgage--

20          THE COURT:  Is it delinquent?

21          MR. KEEFE:  The primary mortgage is in arrearage

22  several months, but I don't think it's in danger of being

23  foreclosed upon or lost in the immediate future.

24          THE COURT:  Well, has there been any

25  notification from the bank?  I mean--

1          MR. AWAL:  Yeah.

2          MR. KEEFE:  If I could speak with his wife

3    briefly.

4    PAUSE

5          MR. KEEFE:  She says no foreclosure notice has

6    been sent or she hasn't received it.

7          THE COURT:  How many months behind?

8          MR. KEEFE:  I believe six, Judge.

9          THE COURT:  And who's the holder of the

10   mortgage?

11         MR. KEEFE:  Ocwen Bank, Judge.

12         THE COURT:  How is that spelled?

13         MR. KEEFE:  O-C-W-E-N?

14         THE DEFENDANT:  Yes.

15         THE COURT:  Ocwen.  And what is available - as

16   of this date, what is available to be posted?

17         MR. KEEFE:  I'm sorry to be, what?

18         THE COURT:  To be posted.

19         MR. KEEFE:  My most, the motion for release on

20   conditions listed a residence on Hartford Street, a

21   condominium that is owned by his wife's aunt who is

22   present in Court, Ms. Monica Ellis and there's

23   approximately $100,000 secured bond that I was proposing.

24   The residence at 10 Hartford Street in Dorchester, Unit 2

25   was assessed and a recent appraisal done at my request, I

1  think at approximately $230,000, Your Honor.  I have

2  payoff statements which there are two mortgages, $100,000

3  primary mortgage, a $28,000 secondary mortgage and with

4  the second mortgage being paid down, I believe there's a

5  $100,000 in it.

6          THE COURT:  So about $100,000 in equity?

7          MR. KEEFE:  Yeah, I think the government did a

8  memorandum today said there's $95,000, but I checked with

9  Attorney Mendoza who put this together and she said

10  conservatively there's a 100 with evidence of the payoff

11  statements.

12          THE COURT:  You want to be heard, Mr. Wild?

13          MR. WILD:  I do, Your Honor, and if I may go

14  back to the Court's first inquiry of defense counsel.

15          I filed a motion which was nothing more than but

16  I think significant asking the Court to authorize and

17  direct the Middleton Medical facility personnel to

18  disclose the prognosis, their treatment plan, the

19  availability of more treatment plans if it became

20  necessary, how they would respond to anything if it became

21  worse for the defendant, how they've responded to date,

22  all because the defendant raised as a claimed basis for

23  release that he wasn't being properly treated at the

24  medical facility.  As we've discussed before, this is the

25  facility to which U.S. Marshals sends people if they have

1   medical issues.  It's an excellent facility.  They have

2   24/7 service available and they also have immediate ties

3   to emergency rooms and hospital inpatient if that were

4   ever to become necessary.  You have nothing before you of

5   any recent history suggesting that he is not being

6   properly treated there.  So my motion was nothing more

7   than to protect the medical facility people so that they

8   could disclose all of the particulars of the medical

9   treatment and inform that the Court properly of what's

10  available to him so the Court didn't have lingering

11  concerns about whether he was currently being treated

12  properly or would be treated properly.  But they of course

13  need the protection for disclosure purposes.  They need

14  the protection of the Court order.  That's all my motion

15  was.  I think it's significant but that was my motion.

16          The response that you received out of time was

17  to say that to the extent the government is requesting his

18  historical personal medical records pre-detention, he has

19  no objection to the Court getting those, doesn't want the

20  government to get them, which is a totally separate issue

21  and if he wants to provide those to the Court, I don't

22  have any concern about that.  I am somewhat aware of this

23  Court's history in medical matters.  Prior representation

24  of the government is significant medical matters.  You

25  certainly could understand those records better than I

1 could. So I don't have any problem if he wants to

2 provide the historical records to you. My motion was not

3 about that. My motion was to protect the medical

4 personnel at Middleton so that they could discuss those

5 matters and fully inform the Court before it relied upon

6 any claim that there was some terrible overarching medical

7 need that wasn't being met because I don't think that's

8 true. I do suspect, Your Honor, that if you did receive

9 the historical medical records of the defendant pre-

10 detention, you'd probably find that he's had issues like

11 this before. The one thing I will say is that if he

12 really has medical issues he's in a 24/7 medical facility

13 and I'm not suggesting that we--

14         THE COURT: I mean there's no allegation that

15 he's not getting the medications.

16         MR. WILD: None. There was apparently one

17 incident when they did not immediately have available the

18 medication he was customarily using. They supplanted it

19 with something else and then put him immediately back on

20 his ordinary medication. So I think that before the Court

21 were to consider releasing him on the basis of medical

22 claim, at a minimum the Court would need to hear from the

23 medical personnel to say, this really isn't the issue that

24 the defendant is attempting to make it to be. That was

25 the medical issue.

1           Now on the release issue, Your Honor, the Court

2    inquired last time about the status of the property at 40

3    Old Stable Drive in Mansfield.  That's the residence.  The

4    agents on the case did some checking and I've provided

5    defense counsel a copy of this on a prior occasion and

6    again in connection with my memorandum that I filed two

7    days ago on the ninth where I addressed the issue. Very

8    briefly but, it looks as if the property is assessed by

9    the Town of Mansfield at $622,800 but there are loans.

10   There are more than the one that has been mentioned to

11   you.  There are at least three outstanding loans.  It

12   appears to be four actually, totaling approximately

13   $1,239,000 against the property.  Now even if one of those

14   was a line of credit that may have been used to pay off a

15   prior existing lien, it looks as if the remaining three

16   liens total $984,000.

17           THE COURT:  Nine hundred and--

18           MR. WILD:  Eighty-four thousand dollars.  In

19   other words, essentially half more than the appraised

20   value of the property, and as the report that came from

21   pretrial service to the Court said I think a week ago or

22   two weeks ago, the property is in arrears.  Also counsel's

23   letter to the Court when considering counsel's arguments

24   at the last hearing that there be property put up as

25   collateral, his own letter said we don't have any property

1  we can put up as collateral and that's--

2          THE COURT:  Well we've got the aunts condominium

3  now.

4          MR. WILD:  Right, but his letter said I don't

5  have any personal property I can put up as collateral.  I

6  submit, Your Honor, it's because they're all over-

7  mortgaged, overleveraged and that this, I suspect this is

8  not the only property in arrears but certainly this one is

9  in arrears.  As I say in my memorandum, there's very

10 little property interest to keep this defendant available

11 to the Court when he's facing the kind of sentence that he

12 is as I laid out--

13         THE COURT:  The guideline range again.

14         MR. WILD:  Yes, Your Honor, in my memorandum I

15 refer to both cases.  In the first case it looks as if the

16 guidelines were 210 to 262 months together with forfeiture

17 of assets.  That has been enhanced now by three levels

18 because of the commission of offenses while on release,

19 and so now it looks to be 292 to 365 months, and that's on

20 the original case.  Then there's an additional calculation

21 of 51 to 63 months on the second case.  He has no property

22 interest that would suggest to him that he should stay in

23 the District of Massachusetts to face this kind of

24 sentencing and forfeiture of assets.  As to the family

25 ties he involved his own wife in the frauds in which he

1    was engaged.  As I laid out in my memorandum there were

2    50 buildings that he participated in the purchase of that

3    were multi-unit and then those multi-units were

4    immediately converted to condos, aggregating about 180

5    condos.  The general theme was buy the property without

6    down payment from the purchasers because they were flipped

7    and then when were flipped, they were flipped to

8    purchasers that they, the defendant and others acting with

9    him including co-defendants charged in the original case

10    recruited to act as straw buyers using their credit,

11    telling them that these were investment properties and

12    then there were loan applications that were falsified in

13    order to support those mortgages.  Some of the people

14    bought more than one property and listed more than one

15    property as a primary residence when none of the people

16    were primary residents of those properties but they also

17    enhanced their income, their assets, the defendant

18    personally is charged with and two defendants have already

19    pleaded guilty to assisting him in obtaining false

20    verifications of deposits from Bank of America.  They are

21    former Bank of America employees who have admitted that

22    they did that for Mr. Scott so that if someone were

23    recruited as a buyer and their assets didn't qualify for

24    the loan he would simply go to Bank of America to one of

25    these two people.  He paid them money for their services.

1  They would dummy up a verification of deposit to support

2  an enhanced loan application.  And so purchasers were

3  duped into acting as buyers for properties he was first

4  buying and then flipping as condominiums.  I Segway from

5  that, Your Honor, to the aunt of his wife.  I submit that

6  this Court should not permit her to be duped.  This

7  defendant has already told the Court, I promise you I will

8  appear.  You ordered, because he was suspect at the time

9  as a releasee, you ordered a $200,000 bond but with $50

10 secured.  That's already forfeited if he's convicted in

11 the new case because it's a condition of release that he

12 not commit offenses.  If he violated the conditions that

13 $50,000 of his own money is forfeited.  Plus he owes you

14 an additional, I don't mean you personally, Your Honor, he

15 owes the Court an additional $150,000.  He immediately

16 engaged in the conduct charged in count, in the second

17 case four months after release, at least as early as that.

18 If this defendant is willing to commit the kinds of

19 offenses he did while on release, and there's that other

20 violation as well where he traveled out of state without

21 permission, and Gina Afsa was writing that up for the

22 Court.  If he's willing to forfeit his own funds of

23 $200,000, if he has duped all of these other people into

24 becoming buyers under his scheme and they have now

25 suffered credit destruction, their lives have been turned

1 upside down as a result of it, and mind you, this is 180

2 condominium units that were involved.

3 THE COURT: Do we have victims in the courtroom?

4 MR. WILD: I'm sorry?

5 THE COURT: Do we have victims in the courtroom

6 today?

7 MR. WILD: We have a victim from the, I think

8 the victim from the second trial, second case. He may not

9 have received the notice of the change of date. He's

10 appeared at every other hearing, but no we don't have

11 victims of the first case here at the present time, but,

12 Your Honor, when this defendant is willing to do that kind

13 of thing to other people, when he's willing to put his own

14 wife at jeopardy by making her a buyer of properties with

15 him and one of the charged properties in the indictment is

16 22 Elmore Street, he made her the sole purchaser of the

17 building and, therefore, she was his sole seller of three

18 units in that building that are charged in the indictment

19 as fraudulent new loans. He put his own wife at jeopardy

20 to operate his own scheme and yet he wants to tell you I

21 wouldn't jeopardize my family. I wouldn't jeopardize

22 other people but he's made a living doing that including

23 his own wife.

24 THE COURT: Mr. Keefe--

25 MR. KEEFE: Yes, Your Honor?

1    THE COURT:  --in the event the house is

2  foreclosed, where would he go?

3    MR. KEEFE:  Your Honor, I know there's another,

4  a number of family members that live in the Boston area.

5  I haven't discussed with him specifically as to what

6  residence he and his wife and three children would move to

7  but--

8    THE DEFENDANT:  We have a house on the Cape.

9    MR. KEEFE:  --they still own a house on Cape Cod

10  that I think we heard about last time was the subject of

11  certain liens but is not in foreclosure or near

12  foreclosure.

13    THE COURT:  And what's the equity in that?

14    MR. KEEFE:  That property did not have equity.

15  It was mortgaged perhaps to its appraised value and it's

16  also the subject of a lien from a lawsuit that he's part

17  of, but he does own the house and I think there's a paid

18  tenant in the residence?

19    THE DEFENDANT:  Yes.

20    THE COURT:  I don't see anything in the pretrial

21  services report about family in the area.

22    THE DEFENDANT:  I do have family, my mother, my

23  sister.

24    MR. KEEFE:  Yeah, his mother, his sister, I

25  think his wife has family in the area, so Judge, on the

1  issue of--

2          THE COURT:  The mother is no longer in Florida?

3  Is that correct?

4          THE DEFENDANT:  She lives here.  She was looking

5  to move but she's here.  She's in Mansfield.

6          MR. KEEFE:  She's living in Mansfield he tells

7  me.

8          THE COURT:  In the family home?

9          THE DEFENDANT:  In the condo.  I own a condo

10  down the street.

11          MR. KEEFE:  There's a condo down the street that

12  she lives in.

13          THE COURT:  Well he says he owns it.  Does he

14  have equity in that?

15          THE DEFENDANT:  No, it's just that the market

16  crashed so it's upside down.

17          MR. KEEFE:  No, he says no, Judge.

18          THE COURT:  Seems to be an echoing story.

19          MR. KEEFE:  Well, Judge, on the medical grounds

20  issue I did want to mention a couple of things and I

21  haven't gotten updated medical records from today or from

22  last week, but he tells me that there were three days last

23  week, Thursday through Saturday when the medical unit at

24  Middleton told him that they'd run out of both Labetalol

25  and Chlorthalidone, those are two of the blood pressure

1   medicines that he's supposed to be taking on a daily

2   basis.  He tells me his blood pressure levels are still

3   fluctuating wildly.  We did hear, we have a letter from

4   Dr. Hunt who says that some of these blood pressure levels

5   that she reads from the medical records are dangerously,

6   dangerously high and are putting his health at risk.  You

7   know, I have no doubt that by jail standards Middleton may

8   be a good or the best local county lock up that provides

9   medical services to its inmates, but I think it's fair to

10  conclude that the care given at any jail is not ideal and

11  certainly not what he would be receiving from Dr. Hunt who

12  he's treated with for many years.  There are seven, eight

13  hundred inmates at Middleton and I know that they're

14  understaffed and probably very overworked and--

15          THE COURT: Well in reviewing the records I mean

16  he seems to be being monitored quite religiously I would

17  say.

18          THE DEFENDANT:  That's at my request.

19          MR. KEEFE:  Yeah, these are all at his request,

20  Judge.

21          THE COURT:  I mean he's getting his diabetes

22  medication, he's getting his Crestor.

23          MR. KEEFE:  And I don't know - he says that this

24  is all at his request, and I do know that the director who

25  I think has been mentioned by the government as perhaps

1   somebody who would come here, was just fired last week

2   for, supposedly for some HIPPA violations.  So I think his

3   medical issues while being detained remains a significant

4   concern as echoed in Dr. Hunt's letter.

5         With respect to his wife Judge, they've been

6   married for over 15 years.  They obviously live together.

7   They have three children, 12, and two twins that are eight

8   years old.  She's never been charged.  She's never been a

9   target of this investigation as far as I can tell.  I

10   understand--

11         THE COURT:  And what's her immigration status?

12         MR. KEEFE:  She's a Naturalized United States

13   Citizen, as is he.  She, you know, I understand that the

14   company, a company was started many years ago between two

15   couples, my client, his wife and another couple and that

16   the wives purchased a handful of the properties, but

17   there's nothing other than that to suggest that she has

18   any role in the first indictment that Mr. Kettlewell and

19   Silva represent them on, and on that case Judge, I mean I

20   can't speak for what the guidelines are.  I know that a

21   major part of this case was a motion to suppress that

22   Judge Stearns allowed which excludes a significant amount

23   of evidence I'm told by Mr. Kettlewell and that that case

24   now has a June or July trial date and it very well may be

25   triable according to his lawyers in that case and in this

1  case I think it's a, you know, four year or 51 month low

2  in, low in--

3           THE COURT:  And he had, at the time of arrest he

4  had multiple passports?

5           THE DEFENDANT:  No.

6           MR. KEEFE:  No, I'm not aware of that, Judge.

7           THE COURT:  Well the report says the defendant

8  is willing to surrender his passports.

9           MR. KEEFE:  Yeah, he has a United States

10  passport, and I think he maintains dual citizenship with

11  Trinidad.  I don't know if those have been turned in but--

12           THE COURT:  Well two makes it multiple.

13           THE DEFENDANT:  I have a United States passport

14  which the government has since 2009, and I have a Trinidad

15  passport which the United States doesn't recognize it as

16  dual citizenship.

17           MR. KEEFE:  All right, he's not a dual citizen

18  but he has a Trinidadian passport.  Where is that

19  passport?

20           THE DEFENDANT:  It's with the government.

21           MR. KEEFE:  All right, the government has both

22  passports and they've had both since 2009 so--

23           THE DEFENDANT:  I voluntarily gave it.

24           MR. KEEFE:  So, you know, I'm still going

25  through the discovery in this case.  I mean this case I

1   know that I represent him on was part of a civil action

2   that was filed by the victim and the case was about to be

3   settled when he was indicted.  She was going to be

4   reimbursed as part of a negotiated settlement 100%.  Now

5   his aunt--

6           THE COURT:  How much was involved in that case?

7           MR. KEEFE:  What was the total settlement that

8   one, 199?

9           THE DEFENDANT:  199.

10          MR. KEEFE:  So that was a good, approximately

11  200,000, Your Honor.  So his aunt, his wife's aunt is in

12  Court.  She's seated in the front row off to your left,

13  Your Honor.

14          THE COURT:  Would you ask, I'd like her to

15  stand.

16          MR. KEEFE:  I've spoken with her and she is very

17  aware of what she's doing.  She has known Mr. Scott for

18  many, many years.  She cares for him deeply she tells me,

19  and she has expressed to me that she is freely and

20  voluntarily doing this because she is concerned.

21          THE COURT:  Do you understand that if you post

22  this property and if the defendant flees or fails to abide

23  by any condition of release that I might set that you

24  could forfeit this property?  You would have to forfeit it

25  to the government.

1          DEFENDANT'S AUNT:  Yes.

2          THE COURT:  Do you understand that?

3          DEFENDANT'S AUNT:  Yes.

4          THE COURT:  And if you were to do it would you

5    be doing it willingly, freely, and voluntarily?

6          DEFENDANT'S AUNT:  Yes, Your Honor.

7          THE COURT:  All right thank you.  You may be

8    seated.  Let me take a brief recess.  I'll see pretrial.

9    (Court in recess)

10   (4:07:11 PM)

11   (Court back in session)

12   (4:11:40 PM)

13         THE COURT:  All right, having conferred with

14   pretrial services and looked at everything before me at

15   this time, I'm ordering the defendant's detention to be

16   continued in which case I find your motion moot at this

17   time, Mr. Wild.  The defendant's remanded to the custody

18   of the United States Marshals.

19         Mr. Keefe, on the 14 case, if you want your

20   client here for another minute, do we need another status

21   date?

22         MR. KEEFE:  I'd like one, Your Honor, yes.

23         THE COURT:  All right.

24         MR. WILD:  Your Honor, may I address that?

25         THE COURT:  Yup.

1    MR. WILD:  We have made full disclosure.  It's

2  a very simply straightforward case.  There are two

3  witnesses who are husband and wife.  One who has come to

4  every hearing so we know that they are very interested in

5  pursuing the matter.

6         THE COURT:  They're present in the courtroom?

7         MR. WILD:  Not today.

8         THE COURT:  Not today.

9         MR. WILD:  That's the one that I mentioned.  I

10  think--

11         THE COURT:  Yeah, all right.

12         MR. WILD:  --may not have gotten the amended

13  notice.

14         THE COURT:  All discovery's done?

15         MR. WILD:  Essentially all of discovery is done.

16  The only thing that may remain is some 404(b) and there's

17  a timeline on disclosing that.  The governments prepared

18  to take this to trial late January, early February,

19  subject to Judge Gorton's calendar.  I don't think there's

20  any discovery left to do.

21         THE COURT:  Well shall I send it up and say it's

22  unclear whether it be a trial or a plea?

23         MR. KEEFE:  I'd ask Your Honor, for one more

24  status conference.  Part of this case, Judge, involves an

25  allegation that certain email communications traveled

1  electronically through boxes, interstate and I'm in the

2  process of securing a computer person, a computer expert

3  to help review the discovery with me so that I can

4  understand it a little better.

5          THE COURT:  I'll give you 30 days and call it a

6  final status conference.  How does that sound, Mr. Keefe?

7          MR. KEEFE:  That's fine, Your Honor.

8          THE CLERK:  The 12th at 2:30.

9          THE COURT:  January 12th at 2:30, and you agree

10  to exclude the time from today until that date?

11          MR. KEEFE:  I do, Your Honor.

12          THE COURT:  All right, and will you file a

13  motion to that effect, Mr. Wild?

14          MR. WILD:  Yes, Your Honor, although I'm

15  reluctant to say it's a joint motion but yes, I will.

16          THE COURT:  Well it doesn't have to be joint

17  just file it, you know.

18          MR. WILD:  I understand.

19          THE COURT:  All right.

20          MR. WILD:  Thank you, Your Honor.

21          THE COURT:  All right.

22  (Court adjourned)

23  (4:13:45 PM)

24

25

CERTIFICATION

    I, Maryann V. Young, court approved transcriber,

certify that the foregoing is a correct transcript from

the official digital sound recording of the proceedings in

the above-entitled matter.


/s/ Maryann V. Young                    July 20, 2015